Meyer, J.
(dissenting). The State fails to carry out its parens patriae function when it analyzes a custody issue solely in terms of the fitness of the parents and of keeping siblings together, and fails to consider the effect of the decision made upon the child who is the subject of the custody dispute.
Whether one parent or the other is more at fault for the financial war that has been waged between them, although not entirely beside the point, is of much less importance in evaluating the best interests of the child than the effect of that war upon the relationship between the child and the custodial parent. Three impartial court-appointed professionals have concluded that Steven was being emotionally damaged by his mother’s constant involvement of him in her monetary disputes with his father and have stated that Steven’s best interests not only will be served by a change in custody, but that change is imperative. Moreover, a seasoned Trial Judge, having seen and heard both parties and the child as well as the guardian and the impartial psychiatrists, has concluded that the mother’s testimony and actions, in court and out, confirm the need for the change.
Lest there be any question concerning the strength of the testimony and affidavits upon which the Trial Judge acted, I quote from it and from his decision.
*959 The child psychiatrist first appointed, Dr. Frank J. Cur-ran, in his affidavit of October 4, 1979, “urgently” asked that Steven be permitted to live with his father. His reasons:
“It is not that Steven hates his mother, which he does not, but rather that she is making him sick. He does not understand what is really happening between his parents, and everything Mrs. LaBow says is confusing him much more.
“Were she to obtain regular psychiatric treatment for herself, I believe that Mrs. LaBow might at some time in the future calm down and be able to act a bit more normally. There is little reason, however, to hope that such a development will occur. At my suggestion Mrs. LaBow began seeing Dr. Hilda Falk earlier this year * * * Unfortunately, Mrs. LaBow stopped seeing Dr. Falk * * * after two visits.
^ ^ ^
“There is no question in my mind that Mrs. LaBow is not only damaging and interfering with Steven’s important relationship with his father, but she is also making Steven into a nervous, depressed child, developing in him crippling fears and neurotic guilt and anxiety to an extent that may not be reparable in the future if custody is not changed immediately, and I am fearful that he will now again have trouble in school.”
The guardian ad litem for Steven, Austin G. Lopez, in his affidavit of October 11, 1979, concluded that it was “[o]f critical importance * * * that Steven be permitted to live and reside with his father, now” (emphasis in original) and gave as his reasons that:
“Steven is unhappy and tense with his mother, Mrs. LaBow. He feels used by her in her constant attempts to get at his father. He senses he is her pawn, and he hates it.
* *
“In my dealings with Mrs. LaBow, I have found her to be obsessed, erratic, and irrational person. As Steven’s guardian, I am terribly concerned as to Mrs. LaBow’s true motives; I do not believe she has Steven’s best interests at heart * * * The most unfortunate part of it all she told her *960 son in answer to his question: ‘what is more important, the children or the money; -she responded, the money,’ which upset Steven immensely.
“I believe that Steven, who is now terribly upset, will likely suffer severe, permanent consequences if he is forced to stay with his mother, whereas I am confident he will grow up healthier and much happier under his father’s care and custody.”
Because Mrs. _ LaBow had responded to Dr. Curran’s affidavit by characterizing him as “incompetent, biased and or senile,” the Judge who was scheduled to try the matter appointed Dr. Alan M. Levy from the New York County Supreme Court panel of child psychiatrists to examine the parties and their three children and report. Dr. Levy’s report of March 10, 1980, as had Dr. Curran’s earlier report, recommended a change of custody, stating that:
“If Steven’s custody is not transferred to his father I believe he would suffer considerably since. Mrs. LaBow is much more apt to act in an arbitrary fashion in regard to his visitations. In addition to this Mrs. LaBow will probably continue to raise the issue of financial deprivation on a regular basis and will use it to downgrade Mr. LaBow.
“I have discussed my recommendations with both Mr. and Mrs. LaBow. They are fully aware of them. I have informed Mrs. LaBow that I felt she should undertake some kind of therapy to assist her in overcoming some of her emotional conflicts.”
When the matter came on for trial on March 17,1980, it was agreed that the application for change in custody would be postponed for two years pending semiannual reports and “during that two year period the question of custody will in no way be affected by the support problem.” After the settlement was stated for the record the Judge interrogated both parents, the colloquy including Mrs. LaBow’s responses as follows:
“the court: I want to make sure Mr. and Mrs. LaBow that you understand that the child’s happiness is really the only consideration that is involved in this situation, and the only way that the child can feel comfortable is if he *961 thinks his mother and father are comfortable with this arrangement; do you understand that, Mrs. LaBow?
“mrs. labow: Yes.
“the court: You will have to cut down and not talk about your husband whether you feel grieved or not. The important thing is for the child to feel better. That’s one of the things I’m going to be watching for in both of you; do you understand that?
“mrs. labow: Yes.”
Nonetheless, on May 30, 1980, Mrs. LaBow caused Mr. LaBow to be arrested near the Connecticut-Westchester border while Steven was in the car with him. The settlement was then vacated and the matter restored to the Trial Calendar. At trial the guardian testified that: “The only thing that I’ve asked Mrs. LaBow is not to use the children as pawns in her endeavor to harass Mr. LaBow or to try to get money. If she needed any money she should call me directly and that I would intercede on her behalf as far as the trust is concerned, but that she should not at any time use the children in that regard. I felt it was wrong. She did not react to that at all. When Mr. LaBow was arrested in upstate, I believe it was May 30th * * * I asked her about what happened and why did it happen, and wasn’t she aware of Justice Gabel’s order not to have that to happen to the children. She said that it was none of my business.”
Dr. Curran testified that he had been working closely with Dalton School, which Steven attended, because the school had refused to permit Steven to continue “unless he were having psychiatric treatment because he was so disturbed emotionally,” that Steven “was constantly concerned as to what was happening to him at home. If he went to see his father, the mother would create disturbances according to Steven,” that as to Mrs. LaBow’s emotional health “she was in too highly an excitable state to provide the proper tranquility for a little boy who is already having alot of emotional problems, and for that reason I said that I would recommend to the court that the custody be changed, that the father have custody, that the boy have regular ongoing visitations with the mother, but with the hope that the mother would get some psychiatric *962 treatment; and that if that then occurred at some future date the boy could be returned to the custody of his mother”.
It was Dr. Levy’s “opinion that Mrs. LaBow was inflexible as a parent in certain important ways. That she was diminishing the image Steven had of his father by her continued derogation of him” and that continued custody by Mrs. LaBow “would be harmful to the child over the long run” because of her inflexibility and her unwillingness to consider any compromise.
The Trial Judge reached his conclusion that custody should be changed based upon his observations of Mrs. LaBow during trial: “Her facial expressions and actions while sitting in court were very revealing and her tirade on the stand corroborates the impression of the psychiatrist and of my own” and her refusal to let her attorney handle the collection of unpaid alimony and support. He noted that he questioned “whether maternal considerations enter into the use of the police to arrest the father of the child, the father to whom he looks up to and admires; whether bringing criminal charges against the father is in the best interest of Steven; attempts to disbar him,” and concluded that: “The mother seems to have a complete insensitivity as to the effect of her pursuit of this course of action, what the effects are that have been brought on this sensitive child. She is obsessed with what she considers her poverty.”
The Appellate Division, faced with the unanimity of two psychiatrists, the guardian and the Trial Judge, emphasized the fact that the latter had stated that he was not going to assess blame. It noted that neither he nor the psychiatrists nor the guardian had given “any real consideration to the fact that the defendant was willfully creating the very situation of which he complains, nor to the possibility that this was his purpose.” (86 AD2d, p 341.) It concluded that “Plaintiff’s obsession [sic] has plainly been brought about by defendant’s conduct * * * if defendant were to comply with his obligation, the issue would disappear from the case.” (86 AD2d, p 342.)
The purpose of a custody proceeding is not the punishment of either parent for failure to comply with a prior *963 court order. The contempt powers of the court are quite sufficient to that end. Rather, in a custody proceeding “the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly” (Domestic Relations Law, § 70). A serious question concerning Steven’s best interests might exist were his father’s purpose to create a situation which would result in a change of custody, for by so doing he would have demonstrated the same insensitivity to Steven’s welfare as has his mother. However, the record refutes such a conclusion completely. What precipitated the first motion was the threat of Steven’s expulsion from the Dalton School because he was so emotionally disturbed. Had defendant father’s purpose been a change of custody, he would not have stipulated to the settlement of that motion, which called for Steven to remain in his mother’s custody for two years, subject to her agreement not to involve Steven in her financial problems with her husband and subject to semiannual reports to the court. And had plaintiff truly considered the best interests of Steven she could not, less than three months later and without any new precipitating financial cause, so far as the record reveals, have subjected Steven to the trauma of the arrest of his father in his presence.
Although the Appellate Division is not bound by the Trial Judge’s conclusion, we have only recently reiterated that “ The findings of the nisi prius court must be accorded the greatest respect’ ” (Eschbach v Eschbach, 56 NY2d 167, 173, quoting from Matter of Irene O., 38 NY2d 776, 777). To reverse without regard to the Trial Judge’s clearly articulated assessment of plaintiff based on courtroom observation of her words and actions and in the face of unanimous contrary professional opinion, on the “possibility” that defendant father may have been improperly motivated, a possibility that the record clearly refutes, is an abuse of discretion as a matter of law. Nor does the fact that a change in custody would separate Steven from his sisters mitigate against that conclusion for the obvious reason that, had the sisters provided any counterbalance to what the Appellate Division characterized as “plaintiff’s obses *964 sion,” Steven’s severe emotional disturbance would not have developed in the first place.
Accordingly, I would reverse and reinstate the order of Supreme Court, New York County, awarding custody of Steven to his father.
Chief Judge Cooke and Judges Jasen, Jones and Wachtler concur; Judge Meyer dissents and votes to reverse in an opinion in which Judge Simons concurs.
Order affirmed, with costs, in a memorandum.